# United States District Court
## NORTHERN DISTRICT OF CALIFORNIA

E-FILING

SRWST, LP, MARKMEL, LLC, Tax Matters
Partner, ALBERT PIMENTEL, Sole
Member-Manager,

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:

V.

UNITED STATES OF AMERICA

C07  03816 PVT

TO: (Name and address of defendant)

United States of America
Northern District of California
San Jose Division
280 S. 1st Street, 2nd Floor
San Jose, California 95113

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Edward M. Robbins, Jr., Esq.; Charles P. Rettig, Esq.; David Roth, Esq.
Hochman, Salkin Rettig, Toscher & Perez, P.C.
9150 Wilshire Boulevard, Suite 300
Beverly Hills, California 90212-3414

an answer to the complaint which is herewith served upon you, within 60 days after service of this summons upon you,
exclusive of the day of service. If you fail to do so, judgement by default will be taken against you for the relief demanded in
the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Richard W. Wieking
CLERK

DATE JUL 2 5 2007

(BY) DEPUTY CLERK



E-FILING

CONFIDENTIAL FILED

JUL 2 5 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

1  EDWARD M. ROBBINS, JR., ESQ., SBN 82696
   CHARLES P. RETTIG, ESQ., SBN 97848
2  DAVID ROTH, ESQ., SBN 56054
   HOCHMAN, SALKIN, RETTIG, TOSCHER & PEREZ, P.C.
3  9150 Wilshire Boulevard, Suite 300
   Beverly Hills, California  90212
4  Telephone:    (310) 281-3200
   Facsimile:    (310) 859-1430
5
6  Attorneys for Plaintiffs, ALBERT PIMENTEL and MARKMEL, LLC
7
8              IN THE UNITED STATES DISTRICT COURT
9           FOR THE NORTHERN DISTRICT OF CALIFORNIA
10                    SAN JOSE DIVISION
11

C 07 03816 PVT

12  SRWST, LP,
    MARKMEL, LLC, Tax Matters Partner              CASE NO. _____
13  ALBERT PIMENTEL, Sole Member-Manager
14                                                 COMPLAINT FOR READJUSTMENT
             Plaintiffs,                           OF IRS FINAL PARTNERSHIP
15                                                 ADMINISTRATIVE ADJUSTMENTS;
             v.                                    DEMAND FOR JURY TRIAL
16
17  UNITED STATES OF AMERICA,
                                                   BY FAX
18           Defendant.
19

20       COMES NOW, ALBERT PIMENTEL, and MARKMEL, LLC, a Delaware limited liability

21  company (collectively "Plaintiffs"), by their attorneys, and hereby allege as follows:

22           1.    Plaintiff, MARKMEL, LLC, is a Delaware limited liability company ("MARKMEL"),

23  with its principal place of business in San Jose, California, within the Northern District of California, and is

24  the Tax Matters Partner ("TMP") of SRWST, LP, a California Limited Partnership ("SRWST").

25           2.    Plaintiff, ALBERT PIMENTEL, is the sole member-manager of MARKMEL and is

26  a citizen of the United States, residing in the County of Santa Clara, California, within the Northern District

27  of California.

28           3.    The Defendant is THE UNITED STATES OF AMERICA ("United States").

4.      This is an action for the readjustments of Final Partnership Administrative Adjustments asserted by the Commissioner of the Internal Revenue Service ("Commissioner") with respect to the 1999 taxable year of SRWST, as set forth in the Notice of Final Proposed Administrative Adjustments ("FPAA") [Letter 1830 (DO) (Rev 3-2001)], dated April 27, 2007, which was issued by the Office of Internal Revenue Service, Denver Colorado. A copy of the FPAA, together with relevant schedules, is attached hereto as EXHIBIT "A."

5.      The United States has waived sovereign immunity and subject matter jurisdiction is proper pursuant to the provisions of Title 26, United States Code § 6226 and Title 28, United States Code § 1346(a)(1).

6.      Venue is founded upon Title 28, United States Code § 402(a)(1).

7.      The FPAA set forth a proposed adjustment of $98,466,566.00 to SRWST's income for the tax year 1999, all of which is in dispute.

8.      MARKMEL's *pro rata* share of the proposed adjustment as a direct partner of SRWST is $98,466. 57.

9.      As ALBERT PIMENTEL is the sole member-manager of MARKMEL, MARKMEL is a disregarded entity for federal income tax purposes and PIMENTEL is the indirect partner of SRWST who would be responsible for any tax liability attributable to MARKMEL's *pro rata* share of the proposed adjustment.

10.     On or about June 1, 2007, Plaintiff, PIMENTEL, pursuant to the requirements of Title 26, United States Code § 6226(e) of the Internal Revenue Code of 1986 ("IRC"), deposited with the IRS the sum of $48,000.00, representing Plaintiffs' good faith estimate of the amount by which the partner-Plaintiffs' liability would be increased if the treatment of the partnership items set forth in the above-referenced FPAA were upheld.  A copy of the acknowledged receipt of said deposit is attached hereto as EXHIBIT "B."

11.     SRWST was formed in May of 1999 with MARKMEL as its sole, general partner and Steven and Rhonda Willens (the "Willens") as the initial limited partner.

12.     The Willens contributed 1,614,206 shares of Lucent Technologies common stock (the "Lucent Shares")  with as estimated fair market value of $100,000,000.00 in exchange for their ninety-nine

/ / / / /

- 2 -

and nine-tenths percent (99.9%) limited partnership interest in SRWST. MARKMEL contributed $100,100 for its one-tenth of one percent (0.1%) general partnership interest in SRWST.

13.    On May 12, 1999, the Willens contributed their entire limited partnership interest in SRWST to the independent trustee of the Steve and Rhonda Willens 1999 Charitable Remainder Unitrust (the "CRT").

14.    During the taxable years 1999 through 2002, Plaintiff, MARKMEL, was the general partner and TMP of SRWST, maintaining its one-tenth of one percent (0.1%) interest in SRWST's profits and losses. During each of these years, Plaintiff, ALBERT PIMENTEL was the sole member-manager of MARKMEL. As such, MARKMEL is a disregarded entity for federal tax purposes and ALBERT PIMENTEL is deemed the partner of SRWST.

15.    On or about May 13, 1999, MARKMEL on behalf of SRWST entered into a thirty-two (32) month variable prepaid forward contact ("VPFC") with Morgan Stanley & Co. International Limited ("Morgan Stanley").

16.    In accordance with the terms of the VPFC, Morgan Stanley delivered $88,170,030.00 to SRWST in exchange for a pledge of the Lucent Shares as collateral for SRWST's performance of its obligations under the VPFC. The collateral was held by Morgan Stanley & Co. Incorporated as the collateral agent ("Collateral Agent"). The $88,170,030.00 represented eighty-eight and seventeen one-hundredths percent (88.17%) of the agreed-to value of the Lucent Shares, or $61.95 per share.

17.    As pertinent hereto, the VPFC defines the following terms:

(a)    "Maturity Date" - the maturity date for the transaction was January 15, 2002;

(b)    "Settlement Date" - the settlement date for the transaction was January 18, 2002;

(c)    "Cash Settlement Amount" - the cash equivalent of the deliverable number of the Lucent Shares under a Physical Settlement;

(d)    "Floor Price" - the Downside Protection Threshold Price of $61.95 ("Floor Price");

(e)    "Cap Price" - the Threshold Appreciation Price of $74.34 (equal to 120% of Floor Price); and

- 3 -

1             (f)     "Settlement Price" - the closing price of the Shares on the Maturity Date.

2        18.    Physical Settlement required SRWST to deliver to Morgan Stanley, a number of shares

3 of the Shares based on the following formulas:

4             (a)     if the Settlement Price is less than the Floor Price, SRWST will deliver one

5 hundred percent (100%) of the Lucent Shares to Morgan Stanley;

6             (b)     if the Settlement Price is less than or equal to the Cap Price but greater than or

7 equal to the Floor Price, SRWST will deliver to Morgan Stanley the number the Lucent Shares equal to:

8 (Floor Price/Settlement Price) x Lucent Shares/Collateral;

9             (c)     if the Settlement Price is greater than the Cap Price, SRWST will deliver to

10 Morgan Stanley the number Lucent Shares equal to: 1 - ((Cap Price - Floor Price/Settlement Price)) x Lucent

11 Shares/Collateral.

12        19.    By the terms of the Collateral Agreement required by the VPFC:

13             (a)     Morgan Stanley had no right to sell, pledge, re-hypothecate, assign invest, use,

14 commingle, or otherwise dispose of, or otherwise use in its business any collateral during the term of the VPFC

15 unless there was a contractual default;

16             (b)     Morgan Stanley did not have the right to register any of the collateral in its own

17 name, in the name of its custodian, or a nominee for either;

18             (c)     During the term of the VPFC, the voting rights to the Lucent Shares, the rights

19 to receive dividends, and title to the Lucent Shares remained with SRWST; and

20             (d)     Pursuant to §2.04 of the VPFC, SRWST could elect Cash Settlement option by

21 providing written notice at least 30 days prior to the Settlement Date.

22        20.    As the price of the Lucent Shares on the Maturity Date and the Settlement Date was

23 $6.95 and $6.69, respectively, the settlement ratio required one hundred percent (100%) of the pledged Lucent

24 Shares to be delivered to Morgan Stanley.

25        21.    The adjustments for SRWST's 1999 taxable year set forth in the FPAA are based upon

26 the following errors:

27 / / / / /

28 / / / / /

1    (a)    The Commissioner of Internal Revenue ("Commissioner") erred in adjusting

2  SRWST capital gains income by the amount of $98,466,566.00, or any amount, as the result SRWST's

3  entering into the VPFC.

4    (b)    The Commissioner erred in his first alternative position that SRWST was a

5  sham, lacked economic substance and under that the provisions of Treasury Regulations §1.701-2 was formed

6  for and availed of in connection with a transaction a principal purpose of which was to substantially reduce

7  the present value of the partners' aggregate income tax liability.

8    (c)    The Commissioner erred in his first alternative position that SRWST should be

9  disregarded.

10    (d)    The Commissioner erred in his first alternative position that the partners of

11  SRWST should not be treated as partners in SRWST.

12    (e)    The Commissioner erred in his first alternative position that the provisions of

13  Subchapter K of the Internal Revenue Code of 1986 are inapplicable to the transactions engaged in by

14  SRWST.

15    (f)    The Commissioner erred in his first alternative position that the VPFC and the

16  Lucent Shares are deemed held by the CRT and not SRWST.

17    (g)    The Commissioner erred in his first alternative position that CRT, and not

18  SRWST, sold a *pro rata* portion of the Lucent Shares that was subject to the VPFC in each of the years 1999

19  through 2002, inclusive.

20    (h)    The Commissioner erred in his second alternative position that the non-

21  charitable beneficiaries of the CRT should be treated as having distributions from the gains from a closed and

22  completed sale of stock in 1999.

23    (i)    The Commissioner erred in his second alternative position that, for purposes

24  of gain or loss, the remaining partners of SRWST should be treated as if they owned a *pro rata* share of the

25  Lucent Shares.

26    22.    The facts upon which this Complaint are based are as follows:

27  / / / / /

28  / / / / /

- 5 -

(a)    For the taxable year 1999, SRWST's entering into the VPFC did not constitute a closed and completed sale of the Lucent Shares or result in additional capital gain by SRWST in the amount of $98,466,566.00, or any amount.

(b)    SRWST was formed for legitimate business purposes and not for the purpose to reduce any partner's income tax liability and, as such, SRWST should not be disregarded.

(c)    Plaintiffs are partners of SRWST, directly or indirectly.

(d)    The provisions of Subchapter K of the Internal Revenue Code of 1986 are applicable to transactions engaged in by SRWST.

(e)    At the time that SRWST entered into the VPFC, all of the Lucent Shares were owned by SRWST and no portion were owned by the CRT.

(f)    No portion of the Lucent Shares were sold by the CRT in any of the years pertinent herein.

(g)    No non-charitable beneficiaries of the CRT should be treated as having received distributions from a completed sale of the Lucent Shares in 1999 as there was no closed and completed sale of such shares in 1999.

(h)    The Lucent Shares were owned by SRWST and should not be treated as having been owned, *pro rata*, directly by its partners.

23.    Plaintiffs affirmatively allege that the Commissioner's determination as to the amount of the alleged additional capital gain is arbitrary and capricious.

24.    Plaintiffs are the sole owners of their claims against the United States and have made no assignment of such claims.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor as follows:

1.    That SRWST properly reported its VPFC transaction.

2.    That there are no adjustments to be made to SRWST as alleged in the FPAA.

3.    That there is no additional tax due from Plaintiffs [or any other partner of SRWST].

4.    For reasonable attorney's fees.

/ / / / /

/ / / / /

- 6 -

1    5.    For costs of suit herein.

2    6.    For such other and further relief as the Court may deem just and proper.

3

4    DATED: _July 24_, 2007                    Respectfully submitted,

5                                             HOCHMAN, SALKIN, RETTIG, TOSCHER & PEREZ, P.C.

6

7                                             By:

8                                                 EDWARD M. ROBBINS, JR., ESQ.
                                                  CHARLES P. RETTIG, ESQ.
9                                                 DAVID ROTH, ESQ.

10                                            Attorneys for Plaintiffs
                                              ALBERT PIMENTEL and MARKMEL, LLC
11

12   270760.1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "A"

CERTIFIED MAIL

**Internal Revenue Service**
600 17th Street
MS: 4020 DEN
Denver, CO  80202

**Department of the Treasury**

Refer To:  90 Day

Taxpayer Identifying Number:

Name of Partnership:  SRWST, LP

Partnership Identifying Number: 77-0512804

Tax Year Ended: 12/31/1999

**APR 2 7** 2007
Date:

Date FPAA Mailed to the Tax Matters Partner:

Tax Matters Partner
SRWST, LP
1098 Alta Avenue
Mountain View, CA  94043

Person to Contact:    Janice Mueller
Employee Number:    84-20371

Contact Hours:  7:00 AM to 4:00 PM (Monday – Friday)

Contact Telephone Number:    303-446-1306
(not a toll free number)

## NOTICE OF FINAL PARTNERSHIP ADMINISTRATIVE ADJUSTMENT

The law requires us to send a Notice of Final Partnership Administrative Adjustment (FPAA) to the partnership named above, for the tax year shown above, and to each partner who is entitled to receive this notice.

We are proposing adjustments to the partnership items of the partnership and the tax year shown above. We will send the examination report outlining these adjustments to the Tax Matters Partner (TMP) of the partnership. (The TMP is the partner designated by the partnership to deal with the IRS.) He/she is also authorized to act for the partners who are not entitled to receive this notice. Any partner who wants a copy of the examination report should request it from the TMP. If the TMP is unable to provide you with a copy of the examination report, please contact the person named in the heading of this letter.

Taxable Years Ending Before August 6, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease to the tax liability on your individual return. Form 870-P, *Agreement to Assessment and Collection of Deficiency in Tax for Partnership Adjustments*, is a summary of the proposed adjustments to the partnership return. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

Taxable Years Ending After August 5, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease in the tax liability on your individual return. The adjustments may include partnership level determinations regarding penalties and additions to tax that relate to adjustments to partnership items. Form 870-PT, *Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts*, is a summary of the proposed adjustments to the partnership return. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

You have three options available to you:

## 1. If you agree with the adjustments:

Sign and return the enclosed Form 870-P/Form 870-PT. When you sign Form 870-P/Form 870-PT, you are agreeing to pay any additional tax and interest resulting from the adjustments to the partnership return. For tax years ending after August 5, 1997, you are also agreeing to any partnership level determination as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items, if any. In addition, you are waiving your rights to participate in any administrative or judicial proceeding affecting partnership items and in partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items for the tax year in question. This is a binding settlement only if you sign and return Form 870-P/Form 870-PT and we sign on behalf of the Commissioner of Internal Revenue Service. When we sign the agreement form, the one-year extension of the period of limitations on assessments will begin under Internal Revenue Code section 6229(f). Once the agreement is signed by both parties, you may not file a claim to change the items in question or claim a refund/credit based on a readjustment.

Note: If you are the TMP of the partnership, see the section of this letter entitled, *"For the Tax Matters Partner of the Partnership"*.

## 2. If you do not agree with the adjustments:

If you are the TMP of the partnership and want to contest the adjustments in court, you must file a petition within 90 days from the date this letter. During this 90-day period, no other partner may file a petition for judicial review. You can file your petition for readjustment of partnership items with:

1. the United States Tax Court;
2. the United States Court of Federal Claims; or
3. the District Court of the United States, in the district of the partnership's principal place of business.

A petition filed by the TMP precludes all other actions. If the TMP doesn't file a petition by the 90th day from the date the FPAA was mailed, any partner or any 5 percent group entitled to receive this notice may petition one of these courts. A "5 percent group" includes any group of partners who together have an interest of five percent or more in profits of the partnership. The petition must be filed after the 90th day, but on or before the 150th day from the date the FPAA was mailed to the TMP. If more that one petition is filed in Tax Court, the first petition will go forward. All other petitions (even those filed earlier in one of the other courts) will be dismissed. If no one files a petition in Tax Court, the first petition filed in one of the other courts will go forward and subsequent petitions will be dismissed.

Petitions filed with the United States Tax Court must be mailed to:

**United States Tax Court**
**400 Second Street, NW**
**Washington, DC 20217**

Attach a copy of this letter to the petition. The time in which you must file a petition with the court is fixed by law and the court cannot consider your case if your petition is filed late. If this letter is addressed to both a husband and wife and both want to petition the Tax Court, both must sign the petition or each must file a separate signed petition.

When a partner (including each member of a 5 percent group that files a petition) files a petition in either the appropriate District Court or the Court of Federal Claims, the partner filing the petition must deposit the amount that the partner's tax liability would be increased if the treatment of the partnership items on the partner's return were made consistent with the treatment of partnership items under the FPAA. If you reported the partnership items the way the partnership reported them on its return, you can generally determine the amount to deposit by taking your pro rata share of the partnership adjustments into account in recomputing your tax. You must deposit the appropriate amount with the IRS on or before the day you file your petition.

### 3. If you do nothing:

If a petition for readjustment is not filed in any of the courts listed in this letter, the FPAA becomes final, and we will bill you for any additional tax plus interest that you may owe under the FPAA. You will not be permitted to contest the treatment of the partnership items of the partnership under the FPAA in any refund claim or suit. The law allows the Service to bill you 150 days from the mailing date of the FPAA to the TMP.

However, if a petition is filed in the Tax Court, and the Tax Court upholds the adjustments in whole or in part, we will not bill you until the Tax Court decision is final.

You may wish to contact the TMP of the partnership or your tax advisor to discuss this matter.

If you have any questions, please write to the person whose name and address are shown in the heading of this letter. If you write, attach a copy of this letter to help identify your account. Also, include your telephone number and the most convenient time for us to call you in case we need additional information.

If you prefer, you may call the IRS contact person at the telephone number shown in the heading of this letter. If this number is outside your local calling area, there will be a long distance charge to you.

Thank you for your cooperation.

Sincerely,

Tim Conley
Territory Manager, Technical Services, Western

Enclosures:
Copy of this letter

Letter 1830 (DO) (Rev. 3-2001)
Catalog Number 61242U

**FOR THE TAX MATTERS PARTNER OF THE PARTNERSHIP**

If you are the Tax Matters Partner (TMP), you are entitled to make an agreement to bind non-notice partners to the treatment of the partnership items as shown on the enclosed schedule of adjustments. You must add the following statement above the signature blocks on the Form 870-P or Form 870-PT:

"The undersigned Tax Matters Partner is signing this offer on behalf of himself (herself) and all other partners whom he (she) has the authority to bind; a final agreement resulting from the co-signature of the Commissioner of Internal Revenue will be binding on all such other partners."

As the TMP, you may submit a petition, as described above for the partnership on behalf of all partners.

If you have any questions, you can call the IRS contact person at the telephone number shown in the heading of this letter. Thank you for your cooperation.

Letter 1830 (DO) (Rev. 3-2001)
Catalog Number 61242U

Page      of

| Form **4605-A** | Department of the Treasury - Internal Revenue Service<br>**Examination Changes – Partnerships, Fiduciaries, Small Business Corporations, and Domestic International Sales Corporations** |
|---|---|

| Name and Address of Taxpayer | Employer Identification Number (TIN) | | Form Number: |
|---|---|---|---|
| SRWST LP<br>1570 The Alameda, Suite 100<br>San Jose, California 95126 | 77-0512804 | | 1065 |
| | Person Examination Changes Were Discussed With | Name and Title:<br>David Roth, Esq<br>Representative | |

| 1. Adjustments to ordinary, distributable net, or taxable income | Tax Period: 12/31/1999 | Tax Period: | Tax Period: |
|---|---|---|---|
| a. | | | |
| b. | | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| 2. Total adjustment to ordinary, distributable net, or taxable income | | | |
| 3. Ordinary, distributable net, or taxable income as reported | | | |
| 4. Corrected, ordinary, distributable net, or taxable income | | | |
| 5. Other adjustments | | | |
| a.  Portfolio income (loss) interest | | | |
| (1) Adjustment | 0.00 | | |
| (2) As reported | 1,626,586.00 | | |
| (3) Corrected | 1,626,586.00 | | |
| b.  Portfolio income (loss) dividends | | | |
| (1) Adjustment | 0.00 | | |
| (2) As reported | 367,270.00 | | |
| (3) Corrected | 367,270.00 | | |

**Remarks**

| Examiner's Signature:<br><br>Thomas A. Roginski | Employee ID:<br><br>84-10072 | Office:<br><br>Denver, Colorado | Date:<br><br>04/26/2007 |
|---|---|---|---|

RGS Version  7.20.00

Form 4605-A-CG

Taxpayer: SRWST LP
TIN:      77-0512804

Page        of

## Form 4605-A – Other Adjustments (Continued)

| | Tax Period: 12/31/1999 | Tax Period: | Tax Period: |
|---|---|---|---|
| c. Portfolio income net long-term gain (loss) 28% rate | | | |
| (1) Adjustment | 98,466,566.00 | | |
| (2) As reported | 0.00 | | |
| (3) Corrected | 98,466,566.00 | | |
| d. Investment income included in portfolio income | | | |
| (1) Adjustment | 0.00 | | |
| (2) As reported | 1,993,856.00 | | |
| (3) Corrected | 1,993,856.00 | | |
| e. Distributions - money (cash/securities) | | | |
| (1) Adjustment | 0.00 | | |
| (2) As reported | 90,234,166.00 | | |
| (3) Corrected | 90,234,166.00 | | |
| (1) Adjustment | | | |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | | | |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | | | |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | | | |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | | | |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | | | |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | | | |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | | | |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | | | |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | | | |
| (2) As reported | | | |
| (3) Corrected | | | |

Form **4605-A-CG** (continued)

SRWST, LP
77-0512804 – Form 1065
Tax Year Ended December 31, 1999

## EXPLANATION OF ADJUSTMENTS

### 1. Adjustments to Income – Capital Gains – Completed Sale

It is determined that the variable prepaid forward contract entered into by SRWST, LP (hereinafter the Partnership) with respect to its Lucent Technologies Inc. stock in 1999 was a closed and completed sale of such stock in 1999. Rev. Rul. 2003-7 is inapplicable because the agent for the counterparty to the contract was a related party and had the right to use or otherwise hypothecate the stock pursuant to agreements that were an integral part of the transaction.

The amounts received for the Lucent Technologies Inc. stock includes both the cash payments and the value of the limited rights to participate in appreciation. These amounts were equal to the fair market value of the stock used in a forward contract on the day you entered into it. Since the Partnership's basis in the stock was $0, the Partnership had capital gains of $98,466,566 in 1999.

### 2. Alternative Position – Partnership Anti-Abuse Regulations

It is determined that the Partnership was a sham, lacked economic substance, and under § 1.701-2 of the Income Tax Regulations, was formed and availed of in connection with a transaction or transactions a principal purpose of which was to reduce substantially the present value of its partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code. Consequently, it is determined that, for federal tax purposes:

a. The Partnership is disregarded and that all transactions engaged in by the Partnership are treated as engaged in directly by its purported partners.

b. The purported partners of the Partnership should be treated as not being partners in the Partnership.

c. The rules of Subchapter K are inapplicable to the transaction or transactions engaged in by the Partnership.

As a result, the forward contract and the stock subject to it are deemed to be held by The Steve and Rhonda Willens 1999 Charitable

*Remainder Trust (hereinafter the Trust). The Trust is treated as having sold a pro rata portion of the stock subject to the forward contract in each of the years 1999, 2000, 2001, and 2002 as provided in Treas. Reg. § 1.643(a)-8. The amount of the distributions received by Steve Willens and Rhonda Willens, the noncharitable beneficiaries of the Trust, exceeded the allocable amount of basis in the stock held by the Trust and is taxable under I.R.C. § 664 and Treas. Reg. § 1.643(a)-8.*

*Alternatively, for federal income tax purposes, the noncharitable beneficiaries of the Trust are treated as having received distributions of gains from a closed and completed sale of stock in 1999.*

*Furthermore, for purposes of determining their gain or loss, the remaining partners of the Partnership are treated as if they owned a pro rata share of the stock.*

| | Page        of | |
|---|---|---|
| Computer Generated Form 886-S | **Department of the Treasury - Internal Revenue Service**<br>**Partners' Share of Income, Deductions, and Credits** | Schedule Number:<br>1065 |
| TIN and Name of Partnership:<br><br>77-0512804<br><br>SRWST LP | | Taxable Year Ended:<br><br>12/31/1999 |

| Name and TIN of Each Partner:<br><br>(1) | Portfolio income (loss) interest<br><br>(2) | Portfolio income (loss) dividends<br><br>(3) | Portfolio income net long-term gain (loss) 28% rate<br>(4) | Investment income included in portfolio income<br>(5) |
|---|---|---|---|---|
| a. MarkMel LLC<br>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  Status: General | 1,627.00 | 367.00 | 98,467.00 | 1,994.00 |
| b. The Steve & Rhonda Willens CRT<br>77-6173387  Status: Limited | 1,624,959.00 | 366,903.00 | 98,368,099.00 | 1,991,862.00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **Totals** | 1,626,586.00 | 367,270.00 | 98,466,566.00 | 1,993,856.00 |

**Continuation**

| Partner TIN<br>(6) | Distributions - money (cash/securities)<br><br>(7) | (8) | (9) | (10) | (11) |
|---|---|---|---|---|---|
| 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 | 31,297.00 | | | | |
| 77-6173387 | 90,202,869.00 | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Totals** | 90,234,166.00 | | | | |

```
Form 886-A  |      Department of the Treasury      | Schedule No.
            |       Internal Revenue Service        |
            |                                       |
            |        EXPLANATION OF ITEMS           |
            |      Examiner:                        |
```

| Name of Taxpayer: | | Years/Periods |
| --- | --- | --- |
| | | Ended: |
| SRWST LP | | 1999 |

**PRIMARY POSITION:**

Whether a completed sale occurred when the SRWST, LP entered into a variable share prepaid forward contract ("VPFC") with Morgan Stanley & Co. International Limited?

| | 1999 |
| --- | --- |
| Value of Property Received [a] | $ 98,466,566 |
| Basis in Lucent Technologies Stock | $          0 |
| | ----------- |
| Gain from Sale | $ 98,466,566 |
| | =========== |

[a] The consideration received by SRWST, LP is the combination of the cash proceeds of the VPFC and the contingent right to future appreciation, which in total equals the fair market value of the stock conveyed to the purchaser as of the date SRWST, LP entered into the VPFC: $61.00/share multiplied by 1,614,206 shares.

**ALTERNATIVE POSITION:**

Whether the transaction should be recast and the use of SRWST, LP should be disregarded through the application of the partnership anti-abuse rules?

**Facts:**

**Formation of Partnership**

On May 10, 1999, Steve and Rhonda Willens ("Willens") entered into a limited partnership agreement with MarkMel LLC, a Delaware limited liability company, to establish SRWST Limited Partnership ("SRWST LP"), a California limited partnership. The Willens contributed 1,614,206 shares of Lucent Technologies common stock with an estimated fair market value (as per KPMG discount analysis) of $100,000,000 (one hundred million dollars) in exchange for a 99.90 percent limited partnership interest. MarkMel contributed cash of $100,100 (one hundred thousand one hundred dollars) for their 0.10 percent general partnership interest in SRWST Limited Partnership. Albert Pimentel was listed as the sole member of MarkMel LLC. On May 10, 1999, an Option Agreement was executed between Pimentel (Optionor) and Steve and Rhonda Willens (Optionee). The Optionor and Optionee desired to create a mechanism whereby the Optionee would have the right to acquire all of the membership interest of the Optionor in SRWST Limited Partnership.

1

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>SRWST LP | | Years/Periods<br>Ended:<br>1999 |

The partnership agreement provided that its primary purpose is to "manage the property now or hereafter owned by the Partnership; to acquire, manage, and hold for investment purposes, stocks, bonds, securities, interests in partnerships, real estate, or any other property…"

KPMG discount analysis of SRWST LP states that on May 12, 1999, Lucent Technologies common stock had a volume-weighted valuation of $61.2351 per share (Source: Morgan Stanley Inc). The value of the Partnership's Lucent Technologies common stock based upon this closing price was calculated to be approximately $98.8 million. However, due to the structure of the SRWST Partnership which allows Partners to receive the fair value of their pro rata portion of the Partnership within 24 hours, an investment in this Partnership was concluded to be roughly equivalent to an investment in the shares of a publicly held company. In this case, the only difference between an investment in a publicly traded firm and an investment in the Partnership is the potential delay that is inherent with having the General Partner receive notification of the transfer in writing. Investors in a publicly traded firm may purchase stock at any given price and sell their interest in the firm during the same trading day. Thus, KPMG concluded that only a small discount would apply to account for the short holding period between Limited Partners receiving the fair value of their pro rata interests in the Partnership. Thus, KPMG's position was that the pro rata equity value attributable to the subject limited partnership interest in the Partnership should be discounted 1 percent for lack of marketability

### Formation of Charitable Remainder Trust

On May 10, 1999, the Willens established the Steve and Rhonda Willens 1999 Charitable Remainder Unitrust (hereinafter "Willens CRUT"), naming Joseph Sasek as trustee. On May 12, 1999, the Taxpayers contributed their 99.90 percent limited partnership interest in SRWST LP to the Willens CRUT. Thereafter, the Willens CRUT became the sole limited partner of SRWST LP.

Section I - 1.01 of the trust instrument provides that in each taxable year during the term of the Trust, the Trustee shall pay to the Trustors, or to the survivor of them, or to the survivor's estate if they are both deceased, a unitrust amount equal to fifty percent (50%) of the net fair market value of the Trust Estate valued as of the first business day of each taxable year of the Trust (the "Valuation Date"). The term of the Willens CRUT was three years. The Willens CRUT contained express provisions that it was governed by the laws of the State of California and the provisions of the California Revised Principal and Income Act.

2

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>SRWST LP | | Years/Periods<br>Ended:<br>1999 |

The trust instrument also provides that payments to the beneficiaries shall be made from income and, to the extent that income is not sufficient, from principal and that the Unitrust Amount shall be paid in the initial taxable year of the Trust within sixty (60) days from the date of the initial contribution to the Trust, and annually thereafter on the 31st day of January of each taxable year. The trust instrument defines "trust income" as the income of the trust "as defined in Section 643(b) of the Code and the regulations thereunder."

Upon the termination of the term of the Trust, the Trustee is required to distribute all of the then principal and income of the Trust (other than any Unitrust Amount due the Recipients or their estate under the provisions above) to the charitable organization(s) designated by each of the Trustors.

## Variable Prepaid Forward Contract – Stock Purchase Agreement and Collateral Agreement

On May 13, 1999, SRWST LP entered into a thirty-two month variable prepaid forward contract ("VPFC") with Morgan Stanley & Co. International Limited ("the Bank"). The Purchase Agreement ("Agreement") provided that the purchase price for the VPFC was 88.17% of the "initial share price" of $61.95 per share. The Bank disbursed $88,170,030 to the SRWST LP on May 18, 1999. The maturity date for the agreement was January 15, 2002. The Agreement included a Collateral Agreement whereby SRWST LP delivered the stock to a Collateral Agent. The Collateral Agent was Morgan Stanley & Co. Incorporated ("Agent"), an affiliate of the Bank. SRWST LP was required to deliver to the Agent, on or prior to May 18, 1999, the eligible collateral consisting of 1,614,206 shares of Lucent stock. The Collateral Agent has the right to receive and retain as Collateral all proceeds other than ordinary dividends or interest of the collateral.

The Agreement contained a cash settlement option which allowed SRWST LP to pay the settlement price in cash on the settlement date and retain the pledged stock. The Agreement required that SRWST LP notify the Bank at least 30 days prior to settlement of its intention to select this option.

SRWST LP agreed to deliver to the Bank (subject to cash settlement option) a number of shares equal to the product of the base amount of 1,614,206 shares (with respect to each of the agreed upon settlement dates of January 15, 2002 and January 18, 2002) and the settlement ratio for such settlement date on the Settlement Date. The settlement ratio is defined as –

3

| Form 886-A | Department of the Treasury Internal Revenue Service  EXPLANATION OF ITEMS Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:  SRWST LP | | Years/Periods Ended: 1999 |

If the Settlement Price for such Settlement Date is less than $74.34 (Threshold Appreciation Price) but greater than $61.95 (Downside Protection Threshold Price), the Settlement Ratio for such Settlement Date shall be a ratio equal to the Downside Protection Threshold Price divided by the Settlement Price for such Settlement Date.

If the Settlement Price for such Settlement Date is equal to or greater than the Threshold Appreciation Price, then the Settlement Ratio shall be equal to one (1) minus a fraction, the numerator of which shall equal the excess, if any, of the Threshold Appreciation Price over the Downside Protection Threshold Price and the denominator of which shall equal the Settlement Price for such Settlement Date.

If the Settlement Price for such Settlement Date is equal to or less than the Downside Protection Threshold Price, then the Settlement Ratio for such Settlement date shall be one (1).

In this case, the price of Lucent Technologies stock on January 15, 2002 and January 18, 2002 was $6.95 and $6.69 respectively. Therefore, the Settlement Ratio for such settlement date was one (1) and all shares pledged as collateral were required to be delivered.

The consideration received by SRWST, LP is the combination of the cash proceeds of the VPFC and the contingent right to future appreciation, which in total equals the fair market value of the stock conveyed to the purchaser as of the date SRWST, LP entered into the VPFC. Lucent Technologies closed at $61.00/share on May 13, 1999. As such, the consideration received by SRWST, LP for the VPFC was $98,466,566: $61.00/share multiplied by 1,614,206 shares.

## Income allocations and distributions from SRWST LP to the Willens CRUT

Income allocations and distributions from SRWST LP to the Willens CRUT for years 1999 through 2001 were made as follows (note that SRWST, LP does not appear to perform any service other than entering into the VPFC in 1999, considering that it essentially distributed out 100% of its cash that year. In later years it merely collected the minimal dividends on the Lucent stock):

4

```
Form 886-A |       Department of the Treasury       | Schedule No.
           |        Internal Revenue Service         |
           |                                         |
           |          EXPLANATION OF ITEMS           |
           |        Examiner:                        |
           |                                         |
Name of Taxpayer:                                    | Years/Periods
                                                     | Ended:
      SRWST LP                                       |   1999
```

| Year | Willens CRUT share of SRWST LP income | Distributions to Willens CRUT From SRWST LP |
|------|---------------------------------------|---------------------------------------------|
| 1999 | 1,991,862.00 | 90,202,869.00 |
| 2000 | 133,692.00 | 0.00 |
| 2001 | 65,379.00 | 0.00 |
| 2002 | 88,177,646.00 | 82,125.00 |

Distributions from the Willens CRUT to Steve and Rhonda Willens for the years 1999 through 2002 were made on the following dates and distributions were characterized, as follows:

| Distribution Date | Total Distribution | Portion Reported as Taxable | Portion Deemed Non-taxable |
|-------------------|--------------------|-----------------------------|----------------------------|
| 7/11/1999 | 31,265,635 | 2,030,657 | 29,234,978 |
| 1/31/2000 | 34,759,814 | 1,872,577 | 32,887,237 |
| 1/31/2001 | 13,097,377 | 1,009,326 | 12,088,051 |
| 1/31/2002 | 2,409,661 | 2,409,661 | — |
| | 81,532,487 | 7,322,221 | 74,210,266 |

The only funds available to the Willens CRUT to cover the annual unitrust distributions were the proceeds from the VPFC and earnings on its proceeds. During the term of the VPFC, no additional assets were transferred to the Willens CRUT.

5

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>SRWST LP | | Years/Periods<br>Ended:<br>1999 |

## Charitable Contribution Deduction

The amount of the charitable contribution is equal to the present value of the remainder interest computed in accordance with the Service's guidelines, determined as follows:

| (Present Value of Remainder Interest) | = | (Fair Market Value of CRUT) | x | (Term Remainder Factor) |
|---|---|---|---|---|
| $12,422,776 | = | $97,858,747 | x | .126946 |

This amount was claimed on the Willens 1999 tax return (subject to limitations). The charitable beneficiary of the Willens CRUT was MYCFO Foundation. The amount of distributions made by the CRUT to them in 2002 was $11,102,910.

## LAW, RATIONALE AND CONCLUSIONS:

### Common Law Sale

Whether a sale has occurred for federal income tax purposes is a question of fact. Keith v. Commissioner, 115 T.C. 605, 611 (2000); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981); Haggard v. Commissioner, 24 T.C. 1124, 1129 (1955), aff'd, 241 F.2d 288 (9th Cir. 1956). The term "sale" is given its ordinary meaning for Federal income tax purposes. Generally, a sale is defined as the transfer of property for money or the promise to pay money. Commissioner v. Brown, 380 U.S. 563, 570-71 (1965).

In general, an executory contract to sell property (a "mere contract to sell") is not a sale until delivery of the property. See Modesto Dry Yard, Inc. v. Commissioner, 14 T.C. 374 (1950)(tax ownership did not pass until delivery of property subject to executory contract.); Dahlinger v. Commissioner, 20 B.T.A. 176, 184 (1930); aff'd, 51 F.2d 662 (3d Cir. 1931)(same). See also Rev. Rul. 69-93 (no gain or loss realized upon "mere execution of contract to sell real estate").

The key to deciding whether a transaction is a sale is to determine whether the benefits and burdens of ownership have passed. This is a question of fact to be ascertained from the parties' intention as evidenced by the written agreements read in light of the attending facts and circumstances. Grodt & McKay, 77 T.C. at 1237. Grodt & McKay enumerated the following factors that the courts have found are often relevant to determining whether a sale has occurred:

6

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>SRWST LP | | Years/Periods<br>Ended:<br>1999 |

(1) Whether legal title has passed; (2) whether the parties treated the transaction as a sale; (3) whether the alleged purchaser acquired an equity in the property; (4) whether the contract of sale creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the purchaser is vested with the right of possession; (6) whether the purchaser pays property taxes following the transaction; (7) whether the purchaser bears the risk of loss or damage to the property; and (8) whether the purchaser receives the profits from the operation and sale of the property.

Id. at 1237-38.

These factors are nonexclusive and other factors are considered. See, e.g., Haggard, 281 F.2d at 289 (intent of the parties); Brown, 380 U.S. at 568 (good faith bargaining at arm's length and a reasonable price); Grodt & McKay, 77 T.C. at 1240-41 (whether price is approximately equal to fair market value).

Moreover, in analyzing whether ownership of property has been transferred for tax purposes, the relevant inquiry involves weighing which of the various indicia of ownership associated with the particular kind of property are the critical indicia of ownership. This will necessarily vary by the type of property at issue. Some of the enumerated factors may be more relevant and others may be irrelevant to this determination. See Torres v. Commissioner, 88 T.C. 702, 721 (1987); Portermain v. Commissioner, T.C. Memo. 1989-539 (1989).

Although publicly traded stock is comprised of a number of rights and obligations, courts are generally agreed that the rights and obligations most indicative of ownership are: (1) the right to benefit from appreciation or bear the risk of depreciation in value; (2) the right to receive distributions, such as dividends or liquidation proceeds, from the issuer; (3) the right to vote; and (4) the right to sell, pledge, hypothecate, or otherwise dispose of the shares. See Union Planters Nat'l Bank v. United States, 426 F.2d 115 (6th Cir.), cert. denied, 400 U.S. 827 (1970); Miami Nat'l Bank v. Commissioner, 67 T.C. 793 (1977); Hall v. Commissioner, 15 T.C. 195, 200 (1950), aff'd, 194 F.2d 538 (9th Cir. 1952). See also Rev. Rul. 83-47, 1983-1 C.B. 63; Rev. Rul. 70-469, 1970-C.B. 179. Where, however, the stock is unlikely to receive dividends or its voting rights are insignificant, the importance of the right to vote or receive dividends would seem to be reduced.

7

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>SRWST LP | | Years/Periods<br>Ended:<br>1999 |

At the least, these factors should be given greater weight or importance than the other Grodt & McKay factors. Accordingly, we begin our analysis by focusing on these factors:

1.  **Risk of Appreciation and Depreciation:**

    Here the seller has retained a limited right to share in the first 20% of future appreciation. It has given up any share of appreciation above 120% of the value on the date the VPFC was executed. It has also protected itself from any loss in value. It has a very small window of opportunity for gain and it has no risk of loss.

2.  **Rights to Dividends and Distributions:**

    Under the facts described above, the SRWST LP has retained rights to dividends.

3.  **Voting Rights:**

    Under the facts described above, SRWST LP has retained voting rights. The stock comprised a de minimis percentage of the outstanding voting stock of Lucent Technologies. Given such a small amount of stock, the voting rights were not of great significance.

4.  **Right to Sell, Pledge or Otherwise Dispose of Stock:**

    By transferring the stock to the collateral agent, SRWST LP relinquished the right to sell, pledge or otherwise dispose of the stock. The collateral agent, who was also the "Agent" for the Investment Bank in the VPFC, had the right to pledge or repledge, hypothecate or rehypothecate the stock without notice to SRWST.

5.  **Passage of Title:**

    Legal title to the stock will not pass until settlement.

6.  **Treatment by the parties:**

    The parties treated the transaction as a sale. The VPFC document clearly contemplates that the transaction is a sale.

7.  **Present Obligation to Deliver Property and Consideration:**

    The VPFC created a present obligation to deliver the stock to the collateral agent; however, it created an obligation to deliver to

8

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>    SRWST LP | | Years/Periods<br>Ended:<br>    1999 |

Investment Bank at settlement. The VPFC also created a present obligation by the Investment Bank to deliver $88,170,030 to SRWST, LP. Investment Bank transferred the agreed amount to SRWST LP upon execution of the VPFC.

**8.    Arm's Length Nature of the Transaction:**

The SRWST LP and Investment Bank negotiated at arm's length.

**9.    Reasonableness of Price:**

The cash consideration for the stock was slightly more than 88% of its market value. No discounts or premiums were ascribed to the stock when it was valued for purposes of calculating the partner's charitable contribution. The SRWST LP also received the right to share in a portion of future appreciation described above. The combination of cash received and the present value of the future appreciation right is assumed to equal the fair market value of the stock on the execution date. Davis v. Commissioner, 370 U.S. 65 (1962); Philadelphia Park Amusement Co. v. United States, 125 F. Supp. 184 (Ct. Cl. 1954).

**10.    Amount and Receipt of Payment:**

The SRWST LP received more than 88% of the cash value of the stock in 1999 when it entered into the VPFC. SRWST LP had complete and unrestricted use of and control over this cash. The payment was not a downpayment or a deposit, and was not refundable.

While some of these factors indicate that the sale was not until the future settlement of the VPFC, the balance of these factors weighs in favor of a completed and closed sale in the year under examination. Supporting the SRWST LP are the facts that the parties dealt at arm's length and Investment Bank did not acquire the ability to sell the stock in 1999.

On the other hand, indicative of a sale are more factors in both number and importance: Investment Bank paid over 88% of the purchase price in 1999; SRWST LP had an unrestricted and nonrefundable right to the payment of $88,170,030; SRWST LP was fully protected against any downside risk but had a right to only a small amount of the upside potential of the stock; although SRWST LP retained voting rights, the importance of these rights is minimal because of the small percentage of stock owned; SRWST LP placed the actual stock certificates in escrow for the benefit of Investment Bank and then, after that, it could not pledge or otherwise dispose of the stock; and finally, the agent for Investment Bank was a related party and had the right to use or otherwise hypothecate the stock pursuant to agreements that were an integral part of the transaction.

9

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>SRWST LP | | Years/Periods<br>Ended:<br>1999 |

Based on these factors, particularly the factors with the most importance, it must be concluded that a completed and closed sale of the stock occurred when the SRWST LP and Investment Bank executed the VPFC.

Although the VPFC is a closed sale on execution either under a "benefits and burdens" or an "open transaction" analysis, the Service has granted favorable tax treatment to VPFCs that meet certain conditions. In Rev. Rul. 2003-7, 2003-1 C.B. 363, the Service addressed the question of whether a sale occurred when an individual entered into an agreement with an investment bank in which he received cash in exchange for a pledge to deliver a number of publicly traded shares in a later year. The Service analyzed the agreement under the constructive sale principles of section 1259. The Service also looked at factors considered by the courts in determining whether a sale or other disposition of property has occurred since the Code does not contain a definition of the term "sale."

I.R.C. § 1259(a)(1) provides that "the taxpayer shall recognize gain as if such position were sold, assigned, or otherwise terminated at its fair market value on the date of such constructive sale" if there is a constructive sale of an appreciated financial position. An appreciated financial position is "any position with respect to any stock, debt instrument, or partnership interest if there would be gain were such position sold, assigned, or otherwise terminated at its fair market value." I.R.C. §1259(b)(1). For purposes of section 1259, "the term "position" means an interest, including a futures or forward contract, short sale, or option." I.R.C. §1259(b)(3). Under section 1259, a forward contract is a contract to deliver a substantially fixed amount of property for a substantially fixed price. I.R.C. §1259(d)(1). When a forward contract provides for the delivery of an amount of stock that is subject to "significant variation," it does not meet the statutory definition of "forward contract" as defined in section 1259. S. Rep. No. 105-33, at 125-26 (1997), reprinted in 1997-4 (Vol. 2) C.B. 1067, 1205-06.

In Rev. Rul. 2003-7, the Service addressed whether a transaction similar to the VPFC here was taxable as a sale when entered into, either under I.R.C. § 1259 or under a common law "benefits and burdens" analysis. In the ruling, a shareholder held stock in a publicly held corporation. The shareholder entered into a forward contract under which he received cash and pledged to an investment bank the maximum number of shares that the shareholder could be required to deliver under the agreement. The shareholder carried out this pledge by transferring the shares in trust to a third-party trustee, unrelated to the investment bank.

10

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>SRWST LP | | Years/Periods<br>Ended:<br>1999 |

Rev. Rul. 2003-7 concluded that the agreement does not result in a constructive sale of the appreciated stock under section 1259. This was because the agreement provided for the delivery of a number of shares of stock that was subject to "significant variation," so that the arrangement did not constitute a "forward contract" as that term is defined in section 1259(d)(1).

More significantly, the ruling concluded that a shareholder has not sold its appreciated stock currently as a result of the execution of the agreement under common law principles of taxation. There was no sale because the shareholder (1) had "an unrestricted legal right to substitute cash or other shares for the pledged shares" on the exchange date, (2) was not "economically compelled to deliver the pledged shares" on the exchange date, and (3) retained the right to receive dividends and exercise voting rights regarding the stock during the term of the Agreement. However, the ruling cautioned:

> A different outcome may be warranted if a shareholder is under any legal restraint or requirement or under any economic compulsion to deliver pledged shares rather than to exercise a right to deliver cash or other shares. For example, restrictions placed upon a shareholder's right to own pledged common stock after the Exchange Date, or an expectation that a shareholder will lack sufficient resources to exercise the right to deliver cash or shares other than pledged shares, would be significant factors to be weighed in determining whether a sale has occurred.

Rev. Rul 2003-7 does not elaborate on what type of legal restraint or requirement or degree of economic compulsion would suffice to warrant a result different from the result reached in the ruling. Neither does it explain when this legal restraint or economic compulsion must exist.

In this case, the forward contract between the SRWST LP and Investment Bank does not result in a constructive sale under section 1259 because the number of deliverable shares varies depending on the fair market value of the stock on the delivery date. As such, the forward contract is not a contract to deliver a substantially fixed amount of property for purposes of section 1259(d)(1).

The SRWST LP retained the right to vote the pledged shares which is a factor that would tend to support the taxpayer; however, the stock is a publicly traded company and the partnership only owns a small percentage of the outstanding shares. While the Agreement provided that the SRWST LP had the unrestricted legal right to deliver cash to satisfy its delivery obligation instead of the pledged shares upon 30 days written notice, the SRWST LP would have had only the pledged shares and a small amount of cash remaining on account of the mandatory annual unitrust distribution under I.R.C. §

11

```
 Form 886-A |    Department of the Treasury    | Schedule No.
            |       Internal Revenue Service    |
            |                                   |
            |       EXPLANATION OF ITEMS        |
            |       Examiner:                   |
_____|_____|_____
 Name of Taxpayer:                              | Years/Periods
                                                | Ended:
     SRWST LP                                   |    1999
                                                |
```

664(d)(2).

   The SRWST LP transferred its only asset, the shares of stock, to a
pledged collateral account held in its name by broker, which placed
restrictions on the shares in order to secure its delivery obligations.  Under
Grodt & McKay Realty, 77 T.C. 1221, possession by the purchaser is a relevant
factor in determining whether a sale occurred.

   In order to fall within the scope of the protection of Rev. Rul. 2003-7,
the SRWST LP must "not [be] economically compelled to deliver the pledged
shares" on the ultimate settlement date of the arrangement.  A shareholder who
has no ability to reacquire the shares during the term of the agreement has
temporarily abandoned a recognized indicia of ownership (that is, the ability
to dispose of the pledged shares during the term of the agreement). The test
for economic compulsion is made on the date that the contract is entered into.
In this case, the SRWST LP was economically compelled to deliver the pledged
shares of stock since it had only a limited amount of cash and no other
assets.  On account of the required year-end distributions, the SRWST LP could
not have been expected on day 1 to have had sufficient assets to exercise the
cash settlement option.

   As such, a sale occurred on May 13, 1999, the time that the SRWST LP
entered into the Agreement.

**Common Law Sale — Taxpayer's Positions**

   **1. Open Transaction**

   The taxpayer contends that even if the forward contract were construed
as a current sale on day 1, a computation of gain or loss would not be
possible at that time because there is no way to determine the actual number
of shares sold.

   The Service is not persuaded.  Courts have declined to apply the open
transaction doctrine where the taxpayers realize gain on a transaction and the
only question is the amount of gain.  See, e.g., Estate of Bird, 534 F.2d
1214, 1219 (6th Cir. 1976).

   I.R.C. § 451 provides that the amount of any item of gross income shall
be included in the gross income for the taxable year in which it was received
by the taxpayer unless, under the method of accounting used in computing
taxable income, such amount is to be properly accounted for as of a different
period.  Treas. Reg. § 1.451-1(a) provides that gains, profits, and income are
to be included in gross income for the taxable year in which they are actually
or constructively received by the taxpayer unless includible in a different

12

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>SRWST LP | | Years/Periods<br>Ended:<br>1999 |

year based on the taxpayer's accounting method.  I.R.C. § 1001 provides that the gain from the sale or disposition of property is the excess of the amount realized over the adjusted basis of the property sold or disposed of.

Under the open transaction doctrine, a seller may treat a transaction as open when the value of property received cannot be determined and, consequently, cannot be included in amount realized.  In Burnet v. Logan, 283 U.S. 404 (1931), the taxpayer received cash and an interest in a contract providing for the right to receive income from iron ore production of a mine in exchange for stock.  The Court concluded that the gain related to the iron ore contract could not be currently taxed because it did not require production of either a maximum or minimum tonnage or any definite payments. The Court reasoned that the promise of future payments was wholly contingent upon the facts and circumstances and it was not possible to foretell with anything like fair certainty.  Furthermore, the taxpayer might never recoup her capital investment from payments only conditionally promised.

In Tribune Publishing Co. v. United States, 836 F.2d 1176 (9th Cir. 1988), the taxpayer received as part of a settlement agreement, cash, stock, and future discounts on newsprint.  At the time of the settlement agreement, uncertainty existed as to the total amount of the settlement because part was contingent upon the amount of discounting the taxpayer would receive on newsprint over an eight-year period.  Irrespective of the value of future discounts, the taxpayer realized a gain on the transaction because the cash and stock received exceeded its basis in the property exchanged.  The Court read Logan to apply only if there is uncertainty as to whether the taxpayer will realize a profit from the transaction at issue.  The Court held that the open transaction doctrine did not apply to an obligation received in a transaction even though the value of the obligation was uncertain at the time of receipt.

In this case, SRWST LP received the sales proceeds at the time it entered into the VPFC.  At that time, SRWST LP knew that it would give up at least 80 percent of the shares; the only uncertainty was to the exact number of shares it would be required to relinquish.  SRWST LP realized gain on the VPFC transaction irrespective of the exact number of shares ultimately relinquished because the cash received from the Investment Bank exceeded its basis in the shares monetized.

Moreover, the right to substitute cash or other securities does not render the transaction open because this is a condition subsequent.  Numerous cases have held that a condition subsequent does not keep a transaction open. For example, in Davey v. Commissioner, 30 B.T.A. 837, 840 (1934), an option to repurchase given to the seller did not render the sale incomplete or an open transaction.  Rather, upon the sale, the purchase price became the

13

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>SRWST LP | | Years/Periods<br>Ended:<br>1999 |

unrestricted property of the seller and the seller realized gain. Similarly, in Herbert J. Investment Corp. v. United States, 360 F. Supp. 825 (E.D. Wis.1973), aff'd, 500 F.2d 44 (7th Cir. 1974), the sale of a business was considered complete at the time the seller relinquished all power and control over the property although the parties had agreed that the sale would be rescinded if it did not get required regulatory approval. In Major Realty Corp. v. Commissioner, 749 F.2d 1483, 1486 (11th Cir. 1985), a sale was held to occur when taxpayer conveyed a deed for real estate to buyer notwithstanding a simultaneous agreement to exchange the land for other acreage at the buyer's option. In Robinson v. Commissioner, T.C. Memo. 1973-242, the court found that taxpayers properly reported gain from the sale of stock subject to an agreement to repurchase in the year they delivered stock and received the purchase price.

The VPFC is similar to these cases. The SRWST LP delivered shares to an escrow account and received unrestricted right to the cash proceeds. The fact that it had the option (although it did not have the economic resources) to substitute cash or other securities at settlement does not render the sale an open transaction. The delivery of cash or other securities is a contingency that does not defer the sale until the VPFC closes in order to see if the substitution took place. The taxpayer's basis in the specific shares delivered is identifiable at the time of delivery.

Taxpayer may argue that these cases are distinguishable because they involve a condition subsequent and that the VPFC here involves a condition precedent. "A condition precedent requires that something shall happen prior to the vesting of the property in the buyer. A condition subsequent divests by its happening a title which has already vested." Hoffman v. Commissioner, 28 B.T.A. 1264 (1933). The SRWST LP would settle the VPFC with the stock delivered to the collateral agent unless, at its option, it delivered cash or other securities. The benefits and burdens of ownership had transferred from the TP LP to Investment Bank before settlement, however. Thus, the optional substitution of cash or other securities is a condition subsequent that does not prevent the consummation of the sale prior to settlement.

## 2. Forward Contract Is Liability of Partnership

The taxpayer cites Rev. Rul. 88-77, 1988-2 C.B. 129, and Rev. Rul 95-26, 1995-1 C.B. 53, as support for its position that the proceeds from the VPFC constitute a liability which adds basis to the CRT's partnership interest under I.R.C. § 752. As such, the distributions by SRWST LP did not exceed its basis and are not taxable to TP and GP when received.

Rev. Rul. 88-77 addressed the issue of what constitutes a liability under I.R.C. § 752. Rev. Rul. 88-77 states that, for I.R.C. § 752 purposes,

14

```
Form 886-A  |    Department of the Treasury    |  Schedule No.
            |      Internal Revenue Service     |
            |                                   |
            |        EXPLANATION OF ITEMS       |
            |      Examiner:                    |
_____|_____|_____
Name of Taxpayer:                               |  Years/Periods
                                                |  Ended:
      SRWST LP                                  |    1999
                                                |
_____|_____
```

partnership liabilities include an obligation only if, and to the extent that, incurring the obligation (1) creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings), (2) gives rise to an immediate deduction to the partnership, or (3) under I.R.C. § 705(a)(2)(B) (relating to noncapital, nondeductible expenditures of a partnership), currently decreases a partner's basis in the partner's partnership interest.

In Rev. Rul. 95-26, the Service ruled that an obligation to deliver securities created by a short sale is a section 752 liability. Cf. Rev. Rul 95-45, 1995-1 C.B. 53 (short sale obligation is a liability for purposes of I.R.C. §§ 357 and 358). This ruling, which relies on Rev. Rul. 88-77, is based on the logic that the term "liability" for section 752 purposes includes any obligation to the extent that its incurrence creates or increases the basis of any partnership asset, including cash. A short sale creates an obligation (to deliver identical securities in the future) and results in an increase in partnership assets (the cash proceeds from the short sale). The Tax Court has adopted the position taken by the Service in Rev. Rul. 95-26. See Salina P'ship LP v. Commissioner, T.C. Memo. 2000-352.

The Service does not dispute that a forward contract creates a liability. Instead, the Service's position is that this argument has no effect because it is treating the VPFC as triggering a sale on the day it was entered into. As such, there is no liability outstanding to increase the basis in SRWST LP.

## Alternative Position – Recast Transaction using Partnership Anti-Abuse Regulation

### 1.  SRWST LP is Disregarded Under the Anti-Abuse Regulation

Treas. Reg. § 1.701-2, the partnership anti-abuse rule, allows the Commissioner to recast partnership transactions if the partnership is formed or availed of to substantially reduce the present value of the partners' federal tax liability in a manner that is inconsistent with the intent of subchapter K of the Code. The Service has the authority to disregard the partnership in whole or in part to adjust or modify the claimed tax treatment.

Subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax. Implicit in the intent of subchapter K are the following requirements:

(1)  The partnership must be bona fide and each partnership transaction or

15

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>SRWST LP | | Years/Periods<br>Ended:<br>1999 |

series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose.
(2) The form of each partnership transaction must be respected under substance over form principles.
(3) Except as otherwise provided in this paragraph (a)(3), the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income (collectively, proper reflection of income). . . .

Treas. Reg. § 1.701-2(a).

The SRWST LP fails to meet the three basic requirements described above. First, the SRWST LP was not a bona fide partnership. Instead, it was formed to reduce substantially the present value of the partner's aggregate federal tax liability. The effect of the transaction was to shift recognition of a large capital gain on the sale of stock to an entity which does not pay tax. The transaction was marketed to taxpayers with large gains to shelter.

Examples 7 and 8 of Treas. Reg. § 1.701-2(d) describe two instances when a partnership is not bona fide. In Examples 7 and 8, the various parties join together for the primary reason of generating tax benefits rather than for purposes of conducting business activities in that form. In both examples, the parties apparently joined together with a multiple step plan to achieve desirable tax results.

In Example 8, land with a built-in loss is transferred into a partnership. The transferring partner's interest is liquidated and he has a loss on the land. The partnership does not make a section 754 election so the partnership also has a loss when the land is sold. According to the analysis following the example, the transaction lacks a substantial business purpose because any such purpose is insignificant compared to the tax benefits of the transaction as structured. The analysis concludes that the partnership is not bona fide and the transaction is not respected under the principles of substance over form. Furthermore, the partnership was formed for the principal purpose of reducing the partners' tax liabilities inconsistent with the intent of subchapter K and does not properly reflect the U.S. taxpayer's income. As such, the transaction described in Example 8 would be recast under the partnership anti-abuse rule.

In Example 7, pursuant to a plan of which the principal purpose was reduction of federal tax by generating artificial losses, a U.S. corporation, a foreign corporation, and a promoter form a partnership. The foreign corporation contributes most of the partnership's capital and initially owns

16

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>SRWST LP | | Years/Periods<br>Ended:<br>1999 |

the largest share of capital and profits. The partnership uses its capital to acquire equipment, subsequently enters into a lease transaction for the equipment, and then sells its right to the lease income. The partnership allocated the majority of the income to the tax neutral foreign corporation. Shortly thereafter, the foreign corporation liquidates its partnership interest resulting in a restatement of the remaining partners' capital accounts. The partnership then participates in a recourse lending transaction, increasing its two remaining partners' outside bases. Finally, the partnership sells the equipment subject to lease, generating a considerable tax loss, but no economic loss, for its two remaining partners. The foreign corporation was interposed in the transaction for no other business purpose than to generate tax benefits.

In both examples, the purported business purpose is insignificant compared to the tax benefit. The transactions lacked a substantial business purpose and were used to substantially reduce a partner's tax liability. The general factors of Examples 7 and 8 are fully present in the instant case. As in the cited examples, the taxpayers participated in a scripted series of steps which related primarily to the generation of tax benefits rather than seeking non-tax economic gain in a joint enterprise. As in Example 7, the partnership had no true economic role in the transactions and served merely as an accommodating party to generate the structured or purported tax result.

In accordance with the second requirement implicit in subchapter K, the form of the tax shelter strategy should not be respected. Under the doctrine of substance over form, the courts may look through the form of a transaction to determine its substance in light of economic realities. As explained by the Supreme Court in Frank Lyon Co. v. United States, 435 U.S. 561 (1978):

> In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," . . . as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." . . . Nor is the parties' desire to achieve a particular tax result necessarily relevant.

Id. at 573. See also Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945)(permitting the true nature of a transaction to be disguised by mere formalisms would seriously impair the effective administration of the tax policies of Congress); Gregory v. Helvering, 293 U.S. 465, 469 (1935)(refusing to give effect to transactions that complied with formal requirements for

17

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>    SRWST LP | | Years/Periods<br>Ended:<br>    1999 |

nontaxable corporate reorganization and finding that the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended).

In cases where a taxpayer is involved in a series of back-to-back actions solely to achieve a particular tax consequence, the courts have applied the step transaction doctrine in determining the substance of the transaction. See Del Commercial Properties, Inc. v. Commissioner, T.C. Memo. 1999-411; Aiken Indus., Inc. v. Commissioner, 56 T.C. 925, 934 (1971). Under the step transaction doctrine, "'a series of transactions designed and executed as parts of a unitary plan to achieve an intended result will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation.'" Federal Nat'l Mortgage Ass'n v. Commissioner, 896 F.2d 580, 586 (D.C. Cir. 1990), cert. denied, 499 U.S. 974 (1991)(quoting Kanawha Gas & Utilities Co. v. Commissioner, 214 F.2d 685, 691 (5th Cir. 1954)). See also Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613 (1938)(finding that "a given result at the end of a straight path is not made a different result because reached by following a devious path").

In the taxpayer's strategy, a series of back-to-back transactions were set up with the sole purpose of reducing the tax liability to the Willens. Rather than monetizing his stock directly and realizing a large capital gain, the Willens contributed highly appreciated stock to the SRWST LP and then transferred his 99.90 percent interest to a short-term, accelerated CRT, the Willens CRUT. The SRWST LP then entered into a VPFC, the proceeds of which were distributed to the Willens CRUT pursuant to the terms of the trust agreement. Upon receipt, the Willens CRUT then passed the partnership distributions to the Willens. The Willens reported only a small portion of the CRUT distributions as income. As such, application of the step transaction doctrine in this case shows that the form should not be respected.

The final element in determining whether a transaction conflicts with the intent of subchapter K requires determining whether the tax consequences to each partner and the transactions between the partner and the partnership accurately reflect the partners' economic agreement and clearly reflect each partner's income. A sham transaction is one which, though proper in form, lacks economic substance beyond the creation of tax benefits. See, e.g., Salina P'ship LP v. Commissioner, T.C. Memo. 2000-352. A taxpayer may establish that a transaction has objective economic consequences where the transaction appreciably affects the taxpayer's beneficial interest. See Knetsch v. United States, 364 U.S. 361, 366 (1960). Modest profits relative to substantial tax benefits are insufficient to imbue an otherwise dubious transaction with economic substance. Salina P'ship, T.C. Memo. 2000-352. See also ASA Investerings P'ship v. Commissioner, 201 F.3d 505, 512 (D.C. Cir. 2000), cert. denied, 531 U.S. 871 (2000) (holding that partnership formed for

18

```
 Form 886-A |      Department of the Treasury      | Schedule No.
            |         Internal Revenue Service      |
            |                                        |
            |          EXPLANATION OF ITEMS          |
            |       Examiner:                        |
 ──────────────────────────────────────────────────────────────────
 Name of Taxpayer:                                  | Years/Periods
                                                    | Ended:
      SRWST LP                                       |   1999
            |                                        |
 ──────────────────────────────────────────────────────────────────
```

tax purpose which engaged in de minimis business activity was not a valid partnership); Boca Investerings v. United States, 314 F.3d 625 (D.C. Cir. 2003)(disregarding partnership where no evidence of a non-tax purpose for creating the partnership was found).

The SRWST LP should be disregarded because its primary purpose was to generate tax benefits for the taxpayers rather than to serve as a means of multiple parties doing business together, as envisioned by subchapter K. These tax benefits are far greater than any potential economic gain from the transactions. The Willens could not have avoided recognition of capital gains directly. The only method for avoiding the gains was the creation of a partnership to hold the variable share forward contract. Although SRWST LP's partnership agreement stated that its primary purpose was to "manage the property now or hereafter owned by the Partnership", they immediately distributed virtually all of its assets in the year of its formation to its partners, thereafter essentially existing as a non-operating entity until its dissolution in 2002. As such, the tax treatment orchestrated by the promoter falls outside the boundaries of treatment contemplated by the Internal Revenue Code and Treas. Reg. § 1.701-2.

Whether or not a particular partnership or partnership transaction was used to substantially reduce taxes in a manner inconsistent with the intent of subchapter K depends on all the facts and circumstances. Treas. Reg. § 1.701-2(c). The regulations provide a nonexclusive list of factors that may indicate a disregard for the intent of subchapter K:

(1) The present value of the partners' aggregate federal tax liability is substantially less than it would have been if the partners had owned the partnership's assets and conducted the partnership's activities directly;

(2) The present value of the partners' aggregate federal tax liability is substantially less than would be the case if purportedly separate transactions that are designed to achieve a particular end result are integrated and treated as steps in a single transaction. . . .;

(3) One or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities . . ., or have little or no participation in the profits from the partnership's activities other than a preferred return that is in the nature of a payment for the use of capital;

(4) Substantially all of the partners (measured by number of interests in the partnership) are related (directly or indirectly) to one another;

(5) Partnership items are allocated in compliance with the literal language of §§ 1.704-1 and 1.704-2 but with results that are inconsistent with the purpose of section 704(b) and those

19

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>SRWST LP | | Years/Periods<br>Ended:<br>1999 |

regulations.  In this regard, particular scrutiny will be paid to partnerships in which income or gain is specially allocated to one or more partners that may be legally or effectively exempt from federal taxation. . . .;

(6)  The benefits and burdens of ownership of property nominally contributed to the partnership are in substantial part retained (directly or indirectly) by the contributing partner (or a related party); or

(7)  The benefits and burdens of ownership of partnership property are in substantial part shifted (directly or indirectly) to the distributee partner before or after the property is actually distributed to the distribute partner (or a related party).

Treas. Reg. § 1.701-2(c).  The subchapter K anti-abuse rule applies only if the principal purpose of the transaction is to reduce substantially the present value of the partners' aggregate tax liability in a manner that is inconsistent with the intent of subchapter K.  Treas. Reg. § 1.701-2(b).

Analysis of the Treas. Reg. § 1.701-2(c) factors show that the SRWST LP should be disregarded:

(1) Direct v. indirect ownership:  Through the use of the SRWST LP, the Willens' federal tax liability is substantially less than if the taxpayers would have sold the stock directly.  Treas. Reg. § 1.701-2(c)(1).

(2) Integration of purportedly separate transactions:  The structure of the transaction, through the use of the SRWST LP, was designed to create basis and defer recognition of gain on the distributions.  Removal of the SRWST LP would result in a substantially larger federal tax liability to the noncharitable beneficiary, taxpayer-husband, than would otherwise result if the partnership were respected.

(3) Interest of nominal partners:  This factor is neutral.

(4) Related parties: At the outset, the SRWST LP was owned 99.90 percent by the Willens and 0.10 percent by MarkMel LLC (whose sole member was a former business associate of Steve Willens). The Willens also had an option agreement whereby they could readily acquire the 0.10% interest held by MarkMel LLC. The Willens then contributed their interest to the Willens CRUT (the Willens were the noncharitable beneficiary).

(5) Allocation of Gains and Losses:  The SRWST LP made distributions to the Willens CRUT which were then distributed to its beneficiaries. Substantially all of the distributions to the noncharitable beneficiary,

20

| Form 886-A | Department of the Treasury Internal Revenue Service | Schedule No. |
|---|---|---|
| | EXPLANATION OF ITEMS Examiner: | |
| Name of Taxpayer: SRWST LP | | Years/Periods Ended: 1999 |

the Willens, were treated as non-taxable return of corpus. By treating the distributions to TP as nontaxable returns of corpus, in essence, SRWST LP allocated all of the gains to the charity when it made the final distribution at the end of the CRUT term.

(6) Retention of Contributed Property/Benefits and Burdens: This factor may be present if we consider the receipt of cash approximately equal to the fair market value of the property as a benefit. The highly appreciated stock was monetized through a VPFC a few weeks after it was contributed. The Willens then received nontaxable distributions over the three year life of the trust totaling approximately 82 percent of the fair market value of the stock at the time it was monetized.

(7) Distribution of Contributed Property: This factor is neutral.

The facts and circumstances indicate that the taxpayers' strategy disregarded the intent of subchapter K. The principal purpose of the strategy was to reduce the Willens' tax liability; any potential economic profit was dwarfed by the proposed tax savings. As such, the transaction is not consistent with the intent of subchapter K.

The partnership anti-abuse rule allows the Service to disregard the form of a partnership transaction if a principal purpose of the taxpayer is to achieve substantial tax reduction and this tax reduction is inconsistent with the intent of subchapter K. Treas. Reg. § 1.701-2(b) provides that if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast the transaction for federal income tax purposes as appropriate to achieve tax results that are consistent with the intent of subchapter K. Treas. Reg. §1.701-2(b). Thus, even though the transaction may fall within the literal words of a particular statute or regulatory provision, the Commissioner can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K:

(1) The purported partnership should be disregarded in whole or in part, and the partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners;

(2) One or more of the purported partners of the partnership should not be treated as a partner;

(3) The methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income;

21

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>   SRWST LP | | Years/Periods<br>Ended:<br>  1999 |

(4)   The partnership's items of income, gain, loss, deduction or credit should be reallocated; or

(5)   The claimed tax treatment should otherwise be adjusted or modified.

Treas. Reg. § 1.701-2(b).

    In this case, the Service clearly has grounds for disregarding the SRWST LP and the partnership's assets and activities should be considered to be owned and conducted by the Willens CRUT.

    Based on the foregoing, the Service will disregard the SRWST LP and treat the partnership's activities and assets to be owned by the Willens CRUT. As such, the Willens CRUT will be treated as having entered into the VPFC with the Investment Bank.

### 2. Treatment of Non-Charitable Beneficiaries (the Willens):

#### a. Since SRWST LP is Disregarded, the Willens have Tier Two Income under the "Deemed Sale" Rule of .Treas. Reg. § 1.643(a)-8(b)(1):

    A noncharitable beneficiary of a CRT receives either an annuity amount, in the case of a charitable remainder annuity trust ("CRAT"), or a unitrust amount in the case of a charitable remainder unitrust ("CRUT"). An annuity amount is the right to receive annually a specific amount or percentage of the CRAT assets contributed to the trust. I.R.C. § 664(d)(1). A unitrust amount is the right to receive annually a fixed percentage of the CRUT assets determined annually. I.R.C. § 664(d)(2). In order to qualify as a CRT, the trust must pay the annuity or unitrust amount to the noncharitable beneficiaries at least annually. I.R.C. §664(d)(1),(2).

    No additional contributions may be made to a CRAT after the initial contribution. Treas. Reg. § 1.664-2(b). Additional contributions may be made to a CRUT after the initial contribution only when the trust's governing instrument provides for it. Treas. Reg. § 1.664-3(b).

    Although payments to noncharitable beneficiaries are unrelated to trust income, the four-tier system of section 664(b) was designed to ensure that trust taxable income is taxed to beneficiaries. The four-tier system provides that distributions are deemed to have one of the following characteristics in the hands of recipients, determined first by looking at tier 1 and then continuing through to tier 4:

    (1) First, as ordinary income to the extent of the sum of the trust's ordinary income for the taxable year of the trust and its undistributed

22

| Form 886-A | Department of the Treasury<br>Internal Revenue Service | Schedule No. |
|---|---|---|
| | EXPLANATION OF ITEMS<br>Examiner: | |
| Name of Taxpayer:<br><br>    SRWST LP | | Years/Periods<br>Ended:<br>    1999 |

ordinary income for prior years;

(2) Second, as a capital gain to the extent of the trust's undistributed capital gains for the year and the undistributed capital gain of the trust for prior years;

(3) Third, as other income to the extent of such income of the trust for the year and such undistributed income of the trust for prior years;

(4) Fourth, as a distribution of trust corpus. "Corpus" means the net fair market value of the trust assets less the total undistributed income (but not loss) in each of the above categories.

See I.R.C. § 664(b); Treas. Reg. § 1.664-1(d)(1). The determination of the character of amounts distributed shall be made as of the end of the taxable year of the trust. The existence of tier 4 and the process of elimination method by which tier 4 can be reached allows transactions to be structured to obtain tax-free distributions from a charitable remainder trust. If a charitable remainder trust has no ordinary income and no capital gain income, and the distribution is made from principal, the noncharitable beneficiary will not pay any income tax on the distribution. By design, tier 4 allows a taxpayer who contributed after-tax dollars to a trust to avoid paying taxes on those dollars again if they were distributed back to the taxpayer.

In the absence of the charitable remainder trust, the taxpayer could enter into a forward contract or borrow against property to obtain tax-free cash. However, at some point in the future, the forward contract would be closed out resulting in taxable income, or the loan would be paid off with taxable income. Prior to October 18, 1999, this day of reckoning would never occur if a taxpayer placed the property in a charitable remainder trust and the trust entered into a forward contract or borrowed against the property. The tax-free character of the cash was permanently established by its distribution under tier 4 of the distribution rules for charitable remainder trusts. The ultimate taxable event then occurred inside of the trust and was not taxable to the trust itself. By design, the taxable event was usually delayed until the end of the trust term when the charitable beneficiary would receive the only distribution remaining. These transactions were designed to allow the avoidance of taxation on the disposition of highly appreciated property almost in its entirety.

I.R.C. § 643(a)(7) authorizes the Service to "prescribe such regulations as may be necessary or appropriate to carry out the purposes" of the Code provisions relating to the taxation of estates, trusts, and beneficiaries, "including regulations to prevent avoidance of such purposes." On October 18, 1999, proposed regulations were issued in response to abusive transactions

23

| Form 886-A | Department of the Treasury<br>Internal Revenue Service<br><br>EXPLANATION OF ITEMS<br>Examiner: | Schedule No. |
|---|---|---|
| Name of Taxpayer:<br><br>SRWST LP | | Years/Periods<br>Ended:<br>1999 |

that used charitable remainder trusts to convert appreciated assets into cash while avoiding tax on the gain from the disposition of the assets. The proposed regulation, Treas. Reg. § 1.643(a)-8, was finalized on January 5, 2001.

Treas. Reg. § 1.643(a)-8 addresses "abusive transactions" that attempt to use a CRT to convert appreciated assets into cash while avoiding tax on the gain from the disposition. In such transactions, rather than sell highly appreciated assets contributed to the trust, the trustee typically borrows money and engages in a forward sale of the asset (which results in a sale at a future date) or some similar transaction. Because the borrowing, forward sale, or other similar transaction does not result in current income to the trust, the trustee characterizes the subsequent cash distribution to the beneficiary as a tax-free return of corpus under I.R.C. § 664(b)(4).

The "deemed sale" rule of Treas. Reg. § 1.643(a)-8 applies to CRT distributions that fall within tier 4, I.R.C. §664(b)(4)(distributions of trust corpus), when such distributions were made from an amount received by the trust that was not (1) a return of basis of any asset sold by the trust, or (2) attributable to cash contributed to the trust for which a charitable deduction was allowed. See Treas. Reg. § 1.643(a)-8(b)(1). To the extent of any such tier 4 distributions, the CRT will be treated as having sold a pro rata portion of trust assets to the extent of the distribution in the year for which the distributions are made. Trust assets do not include cash or assets purchased with the proceeds of a forward sale. Treas. Reg. § 1.643(a)-8(b)(3). Treas. Reg. § 1.643(a)-8 applies to distributions made by a charitable remainder trust after October 18, 1999.

While the determination of whether a trust qualifies as a CRT is made at the time property is transferred to the trust, the character of a distribution from a CRT is not determined until after the distribution is made. Accordingly, Treas. Reg. § 1.643(a)-8 applied to the distributions made by the TP CRAT after October 18, 1999 even though the regulation was not promulgated at the time the trust was formed. See I.R.C. § 7805(b)(1).

In this case, the Service has applied the § 1.701-2 anti-abuse regulation to disregard the SRWST LP and the partnership's assets and activities are now considered to be owned and conducted by the Willens CRUT. As such, the Willens CRUT will be treated as having entered into the VPFC with the Investment Bank. For distributions to the Willens from Willens CRUT that fall after October 18, 1999, the distributions should be treated as if a pro rata portion of the underlying assets were sold and the distributions take on the character of the income from the deemed sale transaction. Treas. Reg. § 1.643(a)-8.

24

```
Form 886-A │      Department of the Treasury      │ Schedule No.
           │      Internal Revenue Service         │
           │                                       │
           │        EXPLANATION OF ITEMS           │
           │      Examiner:                        │
───────────────────────────────────────────────────────────────────
Name of Taxpayer:                              │ Years/Periods
                                               │ Ended:
     SRWST LP                                  │   1999
                                               │
───────────────────────────────────────────────────────────────────
```

### b. Alternatively, Since SRWST LP is Disregarded, the Willens have Tier 2 Income Because the VPFC is a Common Law Sale

In the alternative, if SRWST LP is disregarded under the partnership anti-abuse regulation, the Willens CRUT is treated as the owner of the Lucent Technologies stock and as having entered into the VPFC with the Bank directly. For the reasons discussed above in the section dealing with the common law sale issue, the sale of the stock took place on the date SRWST LP and Bank entered into the VPFC under common law principles determining whether a sale has occurred for federal tax purposes. Thus, the Willens CRUT is treated as having sold the stock in 1999 and, under I.R.C. § 664(b)(2), the distributions received by the Willens are treated as distributions from Tier 2 consisting of capital gain to the extent the amounts exceed basis.

25

EXHIBIT "B"

LAW OFFICES

# HOCHMAN, SALKIN, RETTIG, TOSCHER & PEREZ, P.C.

DAVID ROTH
DIRECT LINE
(310) 281-3200

9150 WILSHIRE BOULEVARD
SUITE 300
BEVERLY HILLS, CALIFORNIA 90212-3414
www.taxlitigator.com

TELEPHONE
(310) 281-3200
(310) 273-1181
FACSIMILE
(310) 859-5125
Email
Roth@Taxlitigator.com

May 31, 2007

**VIA MESSENGER SERVICE**
Ted Meyer, Territory Manager
Internal Revenue Service
225 West Broadway, 2nd Floor
Glendale, CA 91204

RE:    **MarkMel, LLC & Albert Pimentel**
       **– SSN: 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**
       **– Tax Year: 1998**
       **– IRS Form: 1040**
       **– Deposit Pursuant to 26 U.S.C. 6226(c) and 6603(d)**

Dear Ted:

Albert Pimentel is the sole member-manager of MarkMel, LLC, a disregarded entity for federal tax purposes. MarkMel, LLC was the general partner and Tax Matters Partner of SRWST, LP, a limited partnership. On or about April 27, 2007, the Internal Revenue Service issued a Notice of Final Partnership Administrative Adjustments ("FPAA") to SRWST, LP.

Pursuant to Section 6226(c) of the Internal Revenue Code ("IRC"), we are submitting check no. 0862 in the amount of $48,000.00, representing the good faith estimate of the *pro rata* liability of MarkMel, LLC, and ultimately Mr. Pimentel, based on the adjustments set forth in the FPAA.

In a good faith effort to comply with the terms of Revenue Procedure 2005-18, 2005-13 I.R.B., it is requested that the deposit be identified as a deposit eligible for interest under IRC § 6603(d). The Taxpayers do not concede liability and nothing contained herein should be construed as a concession of any tax liability.

Ted Meyer, Territory Manager
Internal Revenue Service
May 31, 2007
Page 2


Please date-stamp the enclosed copy of this letter and return the copy to our office in the enclosed envelope.  Thank you for your assistance and cooperation.

Very truly yours,

DAVID ROTH

DR/vb
Enclosures
cc:    Mr. Albert Pimentel (w/o encls.)
       Charles P. Rettig, Esq. (w/o encls.)
       Leslie J. Daniels, Esq. (w/o encls.)
       David Kenyon, CPA (w/o encls.)


270248.1

ORIGINAL FILED

1  EDWARD M. ROBBINS, JR., ESQ., SBN 82696
   CHARLES P. RETTIG, ESQ., SBN 97848
2  DAVID ROTH, ESQ., SBN 056054          JUL 2 5 2007
   HOCHMAN, SALKIN, RETTIG, TOSCHER & PEREZ, P.C.
3  9150 Wilshire Boulevard, #300           RICHARD W. WIEKING
   Beverly Hills, California 90212      CLERK, U.S. DISTRICT COURT
4  Telephone: (310) 281-3200           NORTHERN DISTRICT OF CALIFORNIA
   Facsimile: (310) 859-1430                  SAN JOSE
5
6  Attorneys for Plaintiffs, ALBERT PIMENTEL and MARKMEL, LLC
7
8                IN THE UNITED STATES DISTRICT COURT
9              FOR THE NORTHERN DISTRICT OF CALIFORNIA
10                       SAN JOSE DIVISION
11
12  SRWST, LP,
    MARKMEL, LLC, Tax Matters Partner,                    BY FAX
13  ALBERT PIMENTEL, Sole Member-Manager,    C 07   03816
14       Plaintiffs,          CASE NO. _____      PVT
15       v.
16                            DEMAND FOR JURY TRIAL
    UNITED STATES OF AMERICA,
17
18       Defendant.
19
20                    __DEMAND FOR JURY TRIAL__
21       Plaintiffs, ALBERT PIMENTEL and MARKMEL, LLC, hereby demand a jury on all issues
22  so triable under the law.
23  DATED: July 24, 2007
24
25                            HOCHMAN, SALKIN, RETTIG, TOSCHER & PEREZ, P.C.
26                            By: _____
27                                 EDWARD M. ROBBINS, JR., ESQ.
                                   CHARLES P. RETTIG, ESQ.
28                                 DAVID ROTH, ESQ.

                                   Attorneys for Plaintiffs,
                                   ALBERT PIMENTEL and MARKMEL

270760.1

EDWARD M. ROBBINS, JR., ESQ. (SBN 82696)
CHARLES P. RETTIG, ESQ. (SBN 97848)
**DAVID ROTH, ESQ. (SBN 56054)**
HOCHMAN, SALKIN, RETTIG, TOSCHER & PEREZ, P.C.
9150 Wilshire Boulevard, Suite 300
Beverly Hills, CA 90212
Phone: (310) 281-3247
Fax:    (310) 859-5129

Attorneys for Petitioner

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
DIVISION OF SAN JOSE

SRWST, LP, MARKMEL, LLC, Tax    )
Matters Partner, ALBERT PIMENTEL,    )
Sole Member-Manager,    )
              Petitioners,    )
                      )
                      )   C 07 03816   Civ. No. _____
           v.    )
                      )
UNITED STATES OF AMERICA,    )
               Respondent    )

**CERTIFICATE OF INTERESTED PARTIES**

    Plaintiff ALBERT PIMENTEL, by and through his counsel, incorporates himself as the sole interested party.

/ / /
/ / /
/ / /
/ / /
/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

SRWST, LP, MARKMEL, LLC, Tax Matters
Partner, ALBERT PIMENTEL, Sole Member-
Manager,

Dated: July 24, 2007        by    *Edward M. Robbins Jr.*

EDWARD M. ROBBINS, JR., ESQ.
CHARLES P. RETTIG, ESQ.
DAVID ROTH, ESQ.
HOCHMAN, SALKIN, RETTIG, TOSCHER
& PEREZ, P.C.
9150 Wilshire Boulevard, Suite 300
Beverly Hills, CA 90212
Phone: (310) 281-3247
Fax:    (310) 859-5129

271743.1

Certificate of Interested Parties                    2